IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT—CHANCERY DIVISION

| | |
|---|---|
| **Lee Abrams**, an individual derivatively on behalf of Sweports Ltd., and UMF Corporation, and **Tina White**, an individual derivatively on behalf of Sweports Ltd., and UMF Corporation, ) ) ) ) ) ) | |
| | ) Case No. |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | |
| ) | |
| **George Clarke**, an individual, and **Christopher Leisner**, an individual, ) ) | |
| ) | |
| *Defendants*, ) | |
| ) | |
| **Sweports Ltd.**, and **UMF Corporation**, ) | |
| ) | |
| *Nominal Defendants.* ) | |

### VERIFIED COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND OTHER RELIEF

NOW COME the Plaintiffs, Lee Abrams ("Abrams"), an individual derivatively on behalf of Sweports Ltd. ("Sweports") and UMF Corporation ("UMF"), and Tina White ("White"), an individual derivatively on behalf of Sweports and UMF (Abrams and White are hereinafter collectively referred to as "Plaintiffs"), by and through their attorneys, the Law Offices of George Sanders, P.C., and, as for their *Verified Complaint for Breach of Fiduciary Duty and Other Relief* ("Complaint") against Defendants, George Clarke ("Clarke"), an individual, and Christopher Leisner ("Leisner"), an individual (collectively referred to as "Defendants"), allege as follows:

### INTRODUCTION

1.　　Clarke is Sweports' CEO, President, sole director and majority shareholder. UMF is a subsidiary of Sweports and Clarke is UMF's CEO and President. Through his stock and management positions at Sweports and UMF, Clarke has complete control over both entities.



2.     Sweports owns the intellectual property rights to a disinfecting technology called PerfectClean that is manufactured, marketed and sold by UMF. In 2007, Clarke was working on the development of a new cleaning technology that is similar to PerfectClean, but has certain characteristics that made it a possible substitute for PerfectClean products in many applications. Clarke also believed that this new technology had significantly greater market potential than PerfectClean.

3.     Instead of bringing this new technology to Sweports, Clarke and Leisner set up a new company called C2C Innovations, LLC, an Illinois limited liability company ("C2C"), in which they own a controlling interest. Clarke and Leisner then used C2C to obtain the intellectual property rights for the new technology.

4.     C2C, however, did not have any meaningful assets or earnings, and Clarke and Leisner used UMF and Sweports to fund C2C's development efforts. Clarke and Leisner also gave C2C various other intellectual property rights from Sweports.

5.     As part of Clarke and Leisner's efforts to fund C2C and to use UMF and Sweports to further their personal interests, Clarke and Leisner embarked on a scheme designed to strip Sweports of cash through a variety of means.

6.     In pursuing this scheme and the transfer of various intellectual property rights to C2C, Clarke and Leisner breached their fiduciary duties to Sweports and UMF and wasted corporate assets.

7.     As a result of Clarke and Leisner's misconduct, Sweports and UMF, as well as their minority shareholders, were injured.

**THE PARTIES**

8.     Sweports is a closely held Delaware corporation with its principal place of business

2

located in Illinois.

9.　　Sweports is a non-public corporation; its shares are not listed on any national securities exchange.

10.　　Sweports is a holding company that owns the intellectual property rights to the PerfectClean technology. Sweports has no employees (other than Clarke) and almost no operating expenses. Sweports' sole assets are intellectual property rights and its seventy-six percent (76%) controlling stock ownership interest in UMF.

11.　　UMF is an Illinois corporation with its principal place of business located in Illinois. UMF is a subsidiary of Sweports.

12.　　UMF is a non-public corporation; its shares are not listed on any national securities exchange.

13.　　Sweports and UMF are collectively referred to as the "Companies."

14.　　Clarke is an individual who resides within the County of Cook, State of Illinois. Clarke is Sweports' CEO, President, sole director and majority shareholder. Clarke is also UMF's CEO and its President. Clarke is also a UMF director.

15.　　Leisner is an individual who resides within the County of Cook, State of Illinois. Leisner was originally retained by Clarke to assess Sweports' intellectual property rights and to maximize Sweports' efforts to increase the monetary value of those intellectual property rights. Leisner later became UMF's CFO and a UMF director.

16.　　At all times relevant herein, Abrams was and is a minority shareholder of Sweports.

17.　　At all times relevant herein, White was and is a minority shareholder of Sweports.

## JURISDICTION AND VENUE

18.　　Venue is proper in Cook County, Illinois pursuant to Section 5/2-101 of the Illinois

3

Code of Civil Procedure, as the parties are all located in Cook County, Illinois and a significant amount of the occurrences that give rise to this cause of action occurred in the County of Cook, State of Illinois.

## ALLEGATIONS COMMON TO ALL COUNTS

19.     Sweports owns the intellectual property rights to a technology known as PerfectClean, which combines antimicrobial chemistry with a high performance fiber in order to create a cloth that will disinfect surfaces. This technology is used to develop products that have a variety of cleaning applications.

20.     Many years ago, Sweports entered into an irrevocable license agreement ("PerfectClean License") with UMF, granting UMF the exclusive right to use the PerfectClean technology and trademarks. UMF manufactures, markets and sells products that utilize the PerfectClean technology.

21.     Under the PerfectClean License, Sweports is entitled to royalties on all sales of products by UMF that utilize the PerfectClean technology or trademarks.

22.     Sweports' only sources of revenue are from UMF: (i) royalties paid by UMF, and (ii) dividends from UMF.

23.     Although the PerfectClean products constitute UMF's core product line, UMF owns other patents and trademarks that it licenses, sells and markets to distributors and end-user customers.

24.     At all relevant times, Clarke actively controlled and managed UMF's business operations. Clarke oversees UMF's technology programs, marketing efforts and manufacturing efforts. Clarke also makes, or is responsible for, all of UMF's important financial and business decisions.

4

25.    At all relevant times, Clark has actively controlled Sweports through his position as Sweports' CEO, President, sole director and majority shareholder.

## I.    DEFENDANTS' SCHEME TO PERSONALLY BENEFIT THEMSELVES AT THE EXPENSE OF SWEPORTS AND UMF

### A.    Clarke's Fight with the O'Rourke Investors

26.    Approximately ten years ago, Clarke wanted to raise capital for UMF so that it could improve its marketing and sales efforts. Clarke did not have the needed capital, so he entered into a loan agreement with a group of investors ("First Investors"). The First Investors loaned money to UMF and received warrants to acquire UMF stock.

27.    On information and belief, Clarke's relationship with the First Investors deteriorated sometime in 2005 or early 2006. Clarke wanted to repay the monies owed to the First Investors but did not have the necessary funds.

28.    In an effort to obtain these funds, Clarke reached out to a second set of investors, which included Michael J. O'Rourke, Michael J. Moody, John A. Dore, Andrew G. Chenelle ("O'Rourke Investors"), and Abrams. At this time, none of the O'Rourke Investors owned any Sweports stock.

29.    The O'Rourke Investors agreed to lend money to Sweports, which Clarke could then use to repay certain amounts owed to the First Investors. Abrams agreed to sign a related loan guaranty.

30.    In order to effectuate the financing arrangement, Sweports entered into a Loan Guaranty and Stock Purchase Agreement ("Stock Purchase Agreement") in October 2006 with the O'Rourke Investors and Abrams. The Stock Purchase Agreement entitled the O'Rourke Investors and Abrams to each receive 2% of Sweports' stock.

31.    Sweports also entered into a loan agreement with the O'Rourke Investors for

5

$500,000 ("O'Rourke Investors' Loan").

32.    The relationship between Clarke and the O'Rourke Investors quickly deteriorated and Clarke accused the O'Rourke Investors of conspiring with the First Investors to take over Sweports.

33.    Sweports thereafter stopped repaying the O'Rourke Investors' Loan. In June 2007, Clarke had Sweports issue an informal corporate resolution rescinding the Sweports stock issued to the O'Rourke Investors. This rescission did not include Abrams.

34.    The O'Rourke Investors filed several lawsuits against Clarke, Sweports, and other defendants for breach of the O'Rourke Investors' Loan and the Stock Purchase Agreement. The dispute between the O'Rourke Investors and Clarke spawned multiple lawsuits, which were consolidated on February 5, 2008 ("O'Rourke Litigation").

35.    Two sets of counterclaims filed by Sweports were dismissed during the O'Rourke Litigation. Although the defendants were granted leave to file a third set of counterclaims, they did not do so in a timely manner and were denied leave to file those counterclaims after the filing deadline had passed.

36.    After years of litigation and a trial on certain issues, the circuit court in the O'Rourke Litigation entered a judgment against Sweports in favor of the O'Rourke Investors on their breach of contract claim concerning the Sweports stock and awarded damages based on the value of the stock.

37.    On appeal, the Illinois Appellate Court reversed the finding that Sweports had breached the Stock Purchase Agreement. The Appellate Court concluded that Sweports had, in fact, issued the stock to the O'Rourke Investors. Any damages suffered by the O'Rourke Investors occurred as a result of the rescission of their Sweports stock, not from a breach of the Stock

6

Purchase Agreement.

38.     On information and belief, throughout the O'Rourke Litigation, Clarke was concerned that the O'Rourke Investors might obtain a substantial judgment against Sweports.

39.     On information and belief, Clarke also feared that the O'Rourke Litigation could provide the O'Rourke Investors with a new opportunity to challenge his control over Sweports.

## B.     Clark and Leisner's Efforts to Keep a New Cleaning Technology Away from Sweports

40.     The PerfectClean products manufactured by UMF bind an antimicrobial chemical to an ultrafine fiber cloth that traps and removes 99.99% of bacteria from hard surfaces. A benefit from this approach is that the consumer does not have to spread a toxic or caustic chemical onto the surface.

41.     The PerfectClean cloth is not reusable.

42.     On information and belief, by late 2007, Clarke was working on the development of a new cleaning technology utilizing an ultrafine fiber cloth that was reusable.

43.     This new technology involved the binding of chlorine to an ultrafine fiber ("Rechargeable Chlorine Technology").

44.     The Rechargeable Chlorine Technology was based upon a patent held by the University of Texas ("Patent").

### i.     Clarke's efforts with Medetech

45.     In 2007, no product based on the Rechargeable Chlorine Technology existed and the development efforts had been unsuccessful.

46.     At that time, a company called Medetech was trying to develop and commercialize the Rechargeable Chlorine Technology. Medetech was owned and controlled by Simon Johnston ("Johnston").

7

47.     Medetech had previously entered into a license agreement ("Medetech License") with the University of Texas, which gave Medetech the exclusive right to develop and sell products incorporating the Rechargeable Chlorine Technology covered by the Patent.

48.     Under the Medetech License, Medetech was obligated to pay substantial royalties to the University of Texas even though it had not yet developed a commercially viable product using the Patent's technology.

49.     Clarke viewed the Rechargeable Chlorine Technology covered by the Patent as a potential replacement for the PerfectClean products in many different applications. The Rechargeable Chlorine Technology could also expand the types of customers interested in an antimicrobial cloth.

50.     Clarke knew that if the Rechargeable Chlorine Technology was developed successfully, it could dramatically reduce the value of the PerfectClean line of products.

51.     This devaluation of the PerfectClean technology would have, in turn, caused a sharp decrease in Sweports' value.

52.     On information and belief, in 2007 UMF and Medetech started working together on the development of a commercially viable product that would rely on the Patent's technology.

53.     Medetech, however, was unable to commercialize the Rechargeable Chlorine Technology and fell into arrears on the royalties that it owed to the University of Texas.

## ii.     Clarke and Leisner Acquire the Right to Develop the Rechargeable Chlorine Technology

54.     Clarke believed that he could develop and commercialize the Rechargeable Chlorine Technology, and he decided to take over Medetech's development efforts. Clarke believed that cleaning products using the Rechargeable Chlorine Technology had tremendous market potential, but that Medetech did not have the capability to develop the technology.

8

55. In October 2007, Sweports registered, with the U.S. Patent and Trademark Office, the trademark "Micrillon," for use with textile fabric products impregnated with disinfectants for cleaning.

56. Upon information and belief, Clarke intended to use the Micrillon trademark to market and sell products employing the Patent's Rechargeable Chlorine Technology.

57. On information and belief, in late 2007, Clarke and Leisner formulated a plan to obtain a license from the University of Texas covering the Patent's Rechargeable Chlorine Technology.

58. At this time, Clarke was involved in bitter litigation with the O'Rourke Investors that resulted from Clark's stated belief that the O'Rourke Investors were trying to take control of Sweports.

59. On information and belief, sometime in late 2007 or early 2008, Clarke and Leisner decided that they (rather than Sweports or UMF) would obtain a license from the University of Texas for the Patent's Rechargeable Chlorine Technology.

60. Clarke and Leisner decided to create a new company that would acquire a license from the University of Texas with respect to the Patent. This new company would then use UMF to develop the technology, and manufacture, market and sell any new products incorporating the Rechargeable Chlorine Technology.

61. In January 2008, Clarke, along with Leisner and Johnston, formed C2C. Clarke and Leisner created C2C as the entity they would use to acquire a license with respect to the Patent.

62. C2C had three partners: (a) ASCO Group, LLC, an Illinois limited liability company that is owned and managed by Clarke, (b) Antimicrobial Technologies Group, LLC, a limited liability company that is owned and managed by Johnston, and (c) Creative I.P. Solutions,

9

LLC, an Illinois limited liability company that is owned and managed by Leisner and his wife, Deborah Rains.

63.     ASCO Group, LLC (Clarke) owns a 50% ownership interest in C2C. Antimicrobial Technologies Group, LLC (Johnston) owns forty percent (40%) of C2C, and (c) Creative I.P. Solutions, LLC has a (10%) ownership interest in C2C.

64.     Johnston never played any type of meaningful role in C2C.

65.     Clarke was designated C2C's Manager. As C2C's manager, Clarke has complete operational control over C2C. Clarke is also C2C's registered agent and C2C's business address is Clarke's business address.

66.     On information and belief, ASCO Group, LLC's 50% ownership interest in C2C prevents Johnston and Leisner, individually or in concert, from replacing Clarke as C2C's Manager.

### iii.     C2C Acquires the Right to Develop the Patent's Technology

67.     Clarke and Leisner's plan with respect to the Patent involved terminating the Medetech License and having C2C enter into a new license agreement with the University of Texas.

68.     During the spring and summer of 2008, Leisner had numerous meetings and communications with representatives from the University of Texas. Those negotiations covered a wide range of issues, including the royalty rates that C2C would pay the University of Texas, assignment fees, clarifying the definition of C2C's profits, forgiveness of Medetech's debt for past due royalty payments owed to the University of Texas and other royalty fees not included in the Medetech License.

69.     Clarke and Leisner were actively involved in these negotiations with the University

of Texas.

70.     On information and belief, the University of Texas was concerned about entering into a license agreement with C2C because it was a new and unknown entity that had no capital and no operating history. As a result of these concerns, the University of Texas wanted an ownership interest in C2C.

71.     Clarke and Leisner did not want the University of Texas to have any ownership interest in C2C.

72.     During C2C's negotiations with the University of Texas, Leisner made representations to the University of Texas that misleadingly suggested an affiliation between C2C and UMF and Sweports.

73.     In July 2008, Leisner told the University of Texas that C2C was not a start-up company because of its affiliation and partnership with UMF and/or Sweports.

74.     Leisner and Clarke argued that because of C2C's affiliation or partnership with UMF and/or Sweports, the University of Texas was not entitled to get an ownership interest in C2C and, at one point, they falsely described C2C as a joint venture between Medetech, UMF and Sweports.

75.     On information and belief, Clarke and Leisner made these representations because they wanted to use Sweports and UMF's financial condition to support C2C's efforts to secure a license for the Patent.

76.     As a result of these negotiations, the Medetech License was terminated and a separate license agreement was entered into by the University of Texas and C2C on August 25, 2008 ("UofT/C2C License Agreement").

77.     The University of Texas did not obtain an equity interest in C2C in connection with

11

the UofT/C2C License Agreement.

78.     At no time prior to the UofT/C2C License Agreement did Clarke disclose to Sweports or its minority shareholders that he had created C2C, or that he and Leisner had negotiated the UofT/C2C License Agreement.

79.     Clarke did not present the opportunity to develop the Rechargeable Chlorine Technology to Sweports or UMF, or to their minority shareholders, prior to his entering into the UofT/C2C License Agreement.

80.     On information and belief, Clarke never disclosed to Sweports or UMF, or their minority shareholders: (a) his plans to develop the Rechargeable Chlorine Technology; (b) the UofT/C2C License Agreement; or (c) his creating, with Leisner and Johnston, C2C.

81.     Leisner knew that Clarke owed Sweports and UMF various fiduciary duties given Clarke's role as Sweports' CEO, President and sole director and as UMF's CEO and a director.

C.     **Clarke and Leisner Use Sweports and UMF to Further C2C's Interests**

82.     When C2C was created, it was essentially a shell with no employees, no meaningful assets and no internal development or marketing capability. C2C's function was to own the UofT/C2C License Agreement and provide Clarke and Leisner with a vehicle to keep the new Rechargeable Chlorine Technology away from Sweports.

83.     Under the UofT/C2C License Agreement, C2C was obligated to make substantial royalty payments to the University of Texas on a regular basis.

84.     C2C was not able to pay the royalties that it owed under the UofT/C2C License Agreement from its own resources.

85.     C2C did not have the resources to develop the technology covered by the UofT/C2C License Agreement into a commercially viable product.

12

86.     Clarke took various actions enabling C2C to pay the royalties and to develop the Rechargeable Chlorine Technology.

87.     Clarke and Leisner used their control over Sweports and UMF to divert funds from UMF to C2C in order to benefit themselves with respect to the development of the Rechargeable Chlorine Technology.

### i.     The Loans from UMF to C2C and UMF's Development Efforts

88.     In the fall of 2009, Clarke had UMF loan C2C $600,000 through three unsecured Promissory Notes ("UMF Loans"). The UMF Loans were subsequently extended in December 2010.

89.     Clarke sat on both sides of these transactions, and personally benefited from these transactions.

90.     On information and belief, C2C could not have obtained bank financing given its lack of capital and lack of any earnings history.

91.     From its inception to at least the end of 2012, C2C never turned a profit. The only income that C2C generated was $50,000 to $75,000 in consulting revenue.

92.     The UMF Loans reflect Clarke's use of UMF to make a series of loans to himself on favorable terms for his own personal benefit.

93.     Leisner was involved in these loan transactions and also personally benefitted from these transactions.

94.     Upon information and belief, C2C has never repaid the UMF Loans.

95.     Clarke did not notify Sweports or its minority shareholders about the UMF Loans before they were executed. Nor did Clarke ever notify Sweports or any of its minority shareholders about the UMF Loans after he caused UMF and C2C to enter into the UMF Loans.

13

96.     On information and belief, C2C owes UMF at least $900,000 on the UMF Loans at this point.

97.     In addition to the UMF Loans, Clarke and Leisner also caused UMF to devote substantial resources towards the development of the Rechargeable Chlorine Technology covered by the UofT/C2C License Agreement.

98.     On information and belief, C2C did not compensate UMF for these development efforts.

99.     On information and belief, Clarke and Leisner have caused UMF to expend more than $1,000,000 in loans and resources for C2C's benefit.

100.    On information and belief, C2C has not compensated UMF for these expenditures.

        ii.     **Clarke Assigns the Micrillon Trademark to C2C**

101.    Clarke and Leisner caused Sweports to assign the Micrillon trademark to C2C through an assignment agreement ("Micrillon Assignment") dated January 10, 2008 for $1.00 of consideration.

102.    Clarke sat on both sides of this transaction: as the manager and 50% owner of C2C and as Sweports' CEO, President, sole director and majority shareholder.

103.    Given his ownership interest in C2C and his role as C2C's manager, Clarke personally benefitted from the transfer of the Micrillon trademark from Sweports to C2C. Clarke also personally benefitted from C2C's not having to pay Sweports any royalties for its use of the Micrillon trademark.

104.    The Companies' shareholders did not share equally in this benefit.

105.    Clarke did not disclose the Micrillon Assignment to Sweports or its minority shareholders before causing Sweports and C2C to enter into the Micrillon Assignment.

14

106.    Clarke never disclosed the Micrillon Assignment to Sweports' minority shareholders after it was executed by C2C and Sweports.

107.    During the pendency of Sweports' bankruptcy proceedings, on January 11, 2013, Clarke and Leisner had C2C assign the Micrillon trademark back to Sweports.

### iii.    Clarke Has UMF Enter into a License Agreement with C2C Concerning the Rechargeable Chlorine Technology

108.    On April 29, 2010, Clarke, with Leisner's assistance and knowledge, caused UMF to enter into a license agreement with C2C ("UMF/C2C License Agreement") concerning the Rechargeable Chlorine Technology covered by the UofT/C2C License Agreement.

109.    Under the UMF/C2C License Agreement, UMF was permitted to sell products using the technology covered by the UofT/C2C License Agreement.

110.    In return, UMF was required to pay the royalties that C2C owed to the University of Texas pursuant to the UofT/C2C License Agreement.

111.    Clarke sat on both sides of this transaction and personally stood to benefit from this transaction.

112.    The UMF/C2C License Agreement also created a conflict of interest between Clarke and Sweports.

113.    As an owner in C2C and its Manager, Clarke had a strong incentive to maximize any development, marketing and sales efforts made by UMF with respect to the Rechargeable Chlorine Technology. As CEO and President of UMF, Clarke would have to decide the amount of effort and resources that UMF would devote to the Rechargeable Chlorine Technology as opposed to the products incorporating the PerfectClean technology.

114.    On information and belief, neither Clarke nor Leisner disclosed the UMF/C2C License Agreement to UMF's minority shareholders.

15

115. Neither Clarke nor Leisner disclosed the UMF/C2C License Agreement to Sweports or its minority shareholders.

116. UMF's shareholders did not share equally in this benefit.

117. UMF and Sweports, including their minority shareholders, were injured by this transaction.

### iv. The License between C2C and Sweports Concerning PerfectClean

118. On information and belief, Clarke caused Sweports to enter into a license agreement between Sweports and C2C, which permits C2C to use the intellectual property rights related to the PerfectClean technology.

119. On information and belief, Clarke sat on both sides of this transaction.

120. On information and belief, Clarke caused Sweports to license the PerfectClean rights to C2C so that C2C could use PerfectClean technology and trademarks to develop and market any products that C2C was able to develop under the UofT/C2C License Agreement.

121. On information and belief this transaction personally benefitted Clarke and Leisner.

122. Sweports' shareholders did not share equally in this benefit.

123. Neither Clarke nor Leisner disclosed the license agreement between C2C and Sweports regarding the PerfectClean technology to Sweports or its minority shareholders.

124. UMF and Sweports, including their minority shareholders, were injured by this transaction.

### D. Clarke's Efforts to Deny Sweports Revenues in Order to Facilitate His and Leisner's Plans Concerning C2C

#### i. Clark Prevented UMF from Paying Any Meaningful Dividends to Sweports

125. Over a four year time period, Clarke and Leisner caused UMF to expend

16

approximately one million dollars in loans and resources in order to assist in development efforts for C2C.

126.    The funds that Clarke and Leisner had UMF loan or expend on C2C's behalf limited UMF's ability to pay dividends to Sweports and to aggressively market and sell products using the PerfectClean technology.

127.    Clarke wanted to ensure that UMF had the funds C2C needed. Clarke also did not want UMF to place funds into Sweports that might benefit the O'Rourke Investors.

128.    On information and belief, Clarke intended C2C's Micrillon product to replace UMF's PerfectClean products in the market, and he did not want UMF taking any actions that would interfere with this goal.

129.    On information and belief, since 2007, UMF has only paid two dividends to Sweports: one in 2010 ($60,000) and the second in 2012 ($75,000).

130.    UMF had sufficient earnings to pay more dividends to Sweports.

131.    If Clarke had not caused UMF to loan money to C2C and to engage in development efforts for C2C, UMF would have had additional funds to pay to Sweports as dividends.

### ii.    Clarke's Fraudulent Debt/Equity Swap between UMF and Sweports

132.    UMF had incurred significant attorneys' fees in connection with the O'Rourke Litigation.

133.    Clarke, however, did not have UMF pay its share of the attorneys' fees directly. Instead, Sweports paid UMF's attorneys' fees and characterized the payments as a loan from Sweports to UMF.

134.    Before the end of 2008, UMF owed Sweports approximately $1,600,000 stemming from these attorneys' fees.

17

135.    UMF had the ability to repay the $1,600,000 debt.

136.    Instead of having UMF repay this debt to Sweports with cash, Clarke had UMF issue 550 shares of UMF stock to Sweports in 2008 (the "Debt/Equity Swap").

137.    Clarke sat on both sides of this transaction.

138.    Leisner also served as UMF's CFO and as a UMF director when this transaction was completed.

139.    No independent valuation was conducted for the UMF shares in order to ensure that Sweports actually received UMF shares worth $1,600,000.

140.    The 550 UMF shares transferred to Sweports had a value substantially below $1,600,000.

141.    Clark knew that the 550 UMF shares had a value substantially below $1,600,000.

142.    The 550 UMF shares were not worth $1,600,000 for a number of reasons. First, UMF did not have a valuation that would support such a transaction. Second, because Sweports already had a majority interest in UMF, the 550 UMF shares did not materially increase Sweports' control over UMF. Third, because the 550 UMF shares were restricted shares, their value depended on the dividends that UMF paid to Sweports. UMF did not pay any meaningful dividends to Sweports, and Clarke controlled the timing and size of any dividends that UMF paid to Sweports.

143.    Clarke's causing Sweports to exchange a $1,600,000 debt for 550 UMF shares was part of a plan developed by Clarke and Leisner to deny Sweports cash and assets. Clarke and Leisner's actions injured Sweports and its minority shareholders.

144.    On information and belief, Clarke's actions materially contributed to Sweports being placed into bankruptcy.

145.    Clarke did not notify any of Sweports' minority shareholders about the Debt/Equity Swap.

## II.    **FRAUDULENT CONCEALMENT**

146.    Clarke fraudulently concealed his dealings with C2C, the UofT/C2C License Agreement, the Micrillon Assignments and the UMF/C2C License Agreement from Sweports and its minority shareholders.

147.    Clarke also fraudulently concealed the UMF Loans and other expenditures made by UMF on C2C's behalf from Sweports and its minority shareholders.

148.    Clarke fraudulently concealed, from Sweports and its minority shareholders, the loan to UMF in the amount of $1,600,000 for various legal expenses and the repayment of this loan by the issuance of 550 shares of UMF stock.

149.    Clarke concealed from, Sweports and its minority shareholders, that the value of the 550 UMF shares was only a small fraction of the $1,600,000 debt.

150.    Defendants fraudulently concealed the self-dealing transactions and activities constituting corporate waste from Sweports and its minority shareholders.

151.    As a director and officer of Sweports and UMF, Clarke owed a fiduciary duty to the Companies.

152.    As a fiduciary, Clarke has an obligation to disclose facts concerning his self-dealing and corporate waste and misconduct to the Companies and their shareholders.

153.    Clarke breached his obligation to the Companies and their shareholders by failing to disclose his self-dealing and corporate waste.

154.    The Companies' shareholders lacked any actual knowledge of Clarke's misconduct until the end of the Sweports' bankruptcy proceeding, which began in 2012.

19

## III.  DEMAND FUTILITY

155.  During all relevant times, Clarke was Sweports' CEO, President and sole director. During all relevant times, Clarke was UMF's CEO and President, and Clark and Leisner were UMF directors who represented a majority of UMF's board.

156.  Clarke is currently Sweports' CEO, President and sole director.

157.  Clarke and Leisner have control over UMF.

158.  Defendants could not and would not impartially determine whether or not to pursue a derivative action on behalf of Sweports against themselves.

159.  Defendants could not and would not impartially determine whether or not to pursue a derivative action on behalf of UMF against themselves.

**COUNT 1—BREACH OF FIDUCIARY DUTY**
**Self-Dealing and Theft of Corporate Opportunity**
**(Plaintiffs, derivatively on behalf of Sweports, against Clarke)**

160.  Plaintiffs hereby incorporate by reference paragraphs 1 through 159 of this Complaint as if fully set forth herein.

161.  The Rechargeable Chlorine Technology covered by the Patent represents a product that, if developed, would be similar to the PerfectClean products covered by Sweports' intellectual property and sold by UMF.

162.  The Rechargeable Chlorine Technology represents a natural extension of the PerfectClean technology. Products developed using the Rechargeable Chlorine Technology would compete against products using the PerfectClean technology in many different applications.

163.  Sweports had the financial capability to enter into a license for the technology covered by the Patent.

164.  Clarke refused to present this opportunity to Sweports.

165. Clarke then caused UMF to enter into a license agreement with C2C with respect to the Rechargeable Chlorine Technology. This license would prevent Sweports from earning any royalties on the sale of products embodying the Rechargeable Chlorine Technology.

166. Clarke chose to take for his own personal benefit the opportunity created by the Rechargeable Chlorine Technology covered by the Patent.

167. As a Sweports director and officer, Clarke had a fiduciary duty to place Sweports' interests before his own.

168. Clarke violated his fiduciary duties to Sweports when he misappropriated the Rechargeable Chlorine Technology covered by the Patent for his own personal benefit.

169. Sweports' shareholders did not share equally in this benefit.

170. Clarke's misappropriating the Rechargeable Chlorine Technology created a conflict of interest between Clarke and Sweports.

171. Clarke's misappropriating the Rechargeable Chlorine Technology injured Sweports and its minority shareholders.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in Sweports' favor and against Clarke as follows:

a. An award of compensatory damages in an amount to be shown according to proof;

b. An accounting;

c. Disgorgement of any profits Clarke earned through C2C;

d. Imposition of a Constructive Trust;

e. Attorneys' fees and costs as permitted by law; and

f. Such other and further relief as this Honorable Court deems just and fair.

**COUNT II—BREACH OF FIDUCIARY DUTY**
**Self-Dealing and Theft of Corporate Opportunity**

**(Plaintiffs, derivatively on behalf of UMF, against Clarke)**

172.    Plaintiffs hereby incorporate by reference paragraphs 1 through 159 of this Complaint as if fully set forth herein.

173.    The Rechargeable Chlorine Technology covered by the Patent represents a product that, if developed, would be similar to the PerfectClean products sold by UMF.

174.    The Rechargeable Chlorine Technology represents a natural extension of the PerfectClean technology. Products developed using the Rechargeable Chlorine Technology would compete against products sold by UMF using the PerfectClean technology in many different applications.

175.    UMF had the financial capability to enter into a license for the technology covered by the Patent.

176.    Clarke refused to present this opportunity to UMF.

177.    Clarke chose to take, for his own personal benefit, the opportunity created by the Rechargeable Chlorine Technology covered by the Patent.

178.    UMF's shareholders did not share equally in this benefit.

179.    As a UMF director and officer, Clarke had a fiduciary duty to place UMF's interests before his own.

180.    Clarke violated his fiduciary duties to UMF when he misappropriated the Rechargeable Chlorine Technology covered by the Patent for his own personal benefit.

181.    Clarke's misappropriating the Rechargeable Chlorine Technology created a conflict of interest between Clarke and UMF.

182.    Clarke's misappropriating the Rechargeable Chlorine Technology injured UMF.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment

22

in UMF's favor and against Clarke as follows:

    a.  An award of compensatory damages in an amount to be shown according to proof;

    b.  An accounting;

    c.  Disgorgement of any profits Clarke earned through C2C;

    d.  Imposition of a Constructive Trust;

    e.  Attorneys' fees and costs as permitted by law; and

    f.  Such other and further relief as this Honorable Court deems just and fair.

### COUNT III—BREACH OF FIDUCIARY DUTY
**UMF Loans to C2C and Development Efforts**
**(Plaintiffs, derivatively on behalf of UMF, against Defendants)**

183.    Plaintiffs hereby incorporate by reference paragraphs 1 through 159 of this Complaint as if fully set forth herein.

184.    Through three Promissory Notes, UMF loaned $600,000 to C2C in the fall of 2009.

185.    UMF also expended various resources to help C2C develop the technology covered by the Patent.

186.    Clarke controlled C2C at the time and had a personal ownership interest in C2C when UMF loaned the funds to C2C and caused UMF to assist C2C in its development efforts.

187.    Leisner had an ownership interest in C2C when UMF loaned the funds to C2C. On information and belief, Leisner was also UMF's CFO during the time that UMF made some or all of the UMF Loans to C2C.

188.    Leisner had an ownership interest in C2C when UMF's assets and resources were used to assist C2C in the development of the technology covered by the Patent. On information and belief, Leisner was also UMF's CFO during the time that some or all of those development efforts were undertaken.

189.    At the time the UMF Loans were executed and all relevant times thereafter, Clarke controlled UMF.

190.    On information and belief, at the time the UMF Loans were executed and at all relevant times thereafter, Leisner was an officer of UMF.

191.    Leisner also knowingly aided and abetted Clarke in Clarke's violation of his fiduciary duties with respect to the UMF Loans.

192.    C2C did not provide any collateral to UMF to secure the UMF Loans.

193.    C2C had no earnings history and was a speculative venture at the time that UMF made loans to it.

194.    On information and belief, C2C has not made any payments to UMF on the UMF Loans.

195.    Clarke benefited from the UMF Loans personally, sat on both sides of these transactions and essentially had UMF give him money on an unsecured basis.

196.    Leisner benefited from the UMF Loans personally and sat on both sides of these transactions.

197.    Clarke and Leisner's actions represent self-dealing that injured UMF and that were unfair to UMF and its shareholders. Clarke and Leisner breached their fiduciary duties to UMF when they caused UMF to enter into the UMF Loans with C2C.

198.    UMF's shareholders did not share equally in this benefit.

199.    The Defendants' actions injured UMF.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in UMF's favor and against Defendants as follows:

  a.  An award of compensatory damages in an amount to be shown according to proof;

24

b.  An accounting;

c.  Disgorgement of any profits the Defendants earned through C2C;

d.  Imposition of a Constructive Trust;

e.  Attorneys' fees and costs as permitted by law; and

f.  Such other and further relief as this Honorable Court deems just and fair.

## COUNT IV—BREACH OF FIDUCIARY DUTY
### Debt/Equity Swap between UMF & Sweports
### (Plaintiffs, derivatively on behalf of Sweports, against Defendants)

200.    Plaintiffs hereby incorporate by reference paragraphs 1 through 159 of this Complaint as if fully set forth herein.

201.    Sweports loaned $1,600,000 to UMF for various legal expenses incurred by UMF.

202.    Clarke, with Leisner's assistance, caused Sweports to accept from UMF 550 shares of UMF stock for the $1,600,000 debt.

203.    Clarke sat on both sides of this transaction.

204.    Clarke knew, or had reason to know, that the 550 shares of UMF stock had very little value to Sweports.

205.    Clarke caused the Debt/Equity Swap to occur as part of a scheme to deny Sweports any meaningful cash given his dispute with the O'Rourke Investors and his personal interests in C2C.

206.    Leisner knowingly aided and abetted Clarke in Clarke's scheme to deny Sweports any meaningful cash.

207.    Clarke violated his fiduciary duties to Sweports when he caused Sweports to accept the Debt/Equity Swap.

208.    Clarke's actions represent self-dealing that injured Sweports and its minority

25

shareholders.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in Sweports' favor and against Defendants as follows:

  a. An award of compensatory damages in an amount to be shown according to proof;

  b. An accounting;

  c. Disgorgement of any profits the Defendants earned through C2C;

  d. Imposition of a Constructive Trust;

  e. Attorneys' fees and costs as permitted by law; and

  f. Such other and further relief as this Honorable Court deems just and fair.

### COUNT V—BREACH OF FIDUCIARY DUTY
#### Scheme to Strip Sweports of Cash
**(Plaintiffs, derivatively on behalf of Sweports, against Clarke)**

209. Plaintiffs hereby incorporate by reference paragraphs 1 through 159 of this Complaint as if fully set forth herein.

210. By the end of 2007, Clark did not want UMF or C2C to pay any cash to Sweports.

211. Clarke wanted UMF to conserve its cash and assets so that UMF could help C2C make royalty payments to the University to Texas and to help develop the Rechargeable Chlorine Technology covered by the Patent.

212. Clarke also wanted to prevent Sweports from having cash and assets that Sweports might have to pay to the O'Rourke Investors, if they were able to obtain a judgment against Sweports. Such a result would impede Clarke's efforts to develop, market and sell the Rechargeable Chlorine Technology covered by the Patent.

213. Clarke pursued this scheme in order to personally benefit himself given his ownership interest in C2C and his control over C2C.

214.   Sweports' shareholders did not share equally in this benefit.

215.   Clarke's actions constitute self-dealing and a breach of his fiduciary duties to

Sweports.

216.   Clarke's actions injured Sweports and its minority shareholders.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment

in Sweports' favor and against Clarke as follows:

a.   An award of compensatory damages in an amount to be shown according to proof;

b.   An accounting;

c.   Disgorgement of any profits Clarke earned through C2C;

d.   Imposition of a Constructive Trust;

e.   Attorneys' fees and costs as permitted by law; and

f.   Such other and further relief as this Honorable Court deems just and fair.

**COUNT VI—BREACH OF FIDUCIARY DUTY**
**Waste of Corporate Assets – UMF's Loans to Sweports**
**(Plaintiffs, derivatively on behalf of UMF, against Defendants)**

217.   Plaintiffs hereby incorporate by reference paragraphs 1 through 159 of this

Complaint as if fully set forth herein.

218.   Clarke and Leisner caused UMF to lend $600,000 to C2C.

219.   On information and belief, C2C currently owes UMF at least $900,000 on the UMF

Loans.

220.   On information and belief, C2C has not repaid the UMF Loans.

221.   The UMF Loans were used to fund Clarke and Leisner's efforts to develop the

Rechargeable Chlorine Technology covered by the Patent and to pay the royalties owed to the

University of Texas under the UofT/C2C License Agreement.

222.    The UMF Loans have little or no value at this time.

223.    On information and belief, C2C does not have the assets or cash to repay the UMF Loans.

224.    Clarke and Leisner caused UMF to enter into the UMF Loans knowing that, at the time, C2C did not have the ability to repay the UMF Loans.

225.    UMF has suffered significant losses as a result of the UMF Loans.

226.    Clarke and Leisner's actions in connection with the UMF Loans represent the waste of corporate assets.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in UMF's favor and against Defendants as follows:

a.  An award of compensatory damages in an amount to be shown according to proof;

b.  An accounting;

c.  Disgorgement of any profits the Defendants earned through C2C;

d.  Imposition of a Constructive Trust;

e.  Attorneys' fees and costs as permitted by law; and

f.  Such other and further relief as this Honorable Court deems just and fair.

### COUNT VII—BREACH OF FIDUCIARY DUTY
#### Waste of Corporate Assets – Debt/Equity Swap
#### (Plaintiffs, derivatively on behalf of Sweports, against Clarke)

227.    Plaintiffs hereby incorporate by reference paragraphs 1 through 159 of this Complaint as if fully set forth herein.

228.    Clarke caused Sweports to accept 550 shares of UMF stock in exchange for a debt UMF owed Sweports of approximately $1,600,000.

229.    The fair market value of the 550 shares of UMF stock was, at best, only a small

28

fraction of the $1,600,000 debt UMF owed Sweports.

230.    UMF had the ability to repay the $1,600,000 debt over time.

231.    UMF would have had an even greater ability to repay the $1,600,000 debt, if Clarke and Leisner had not used UMF to fund C2C's development efforts and pay the royalty payments C2C owed to the University of Texas.

232.    Clarke knowingly and intentionally caused Sweports to accept UMF shares that had only, at best, a small fraction of the value of the $1,600,000 debt that UMF owed to Sweports.

233.    Clarke's actions in connection with the Debt/Equity Swap represent the waste of corporate assets.

234.    Sweports and its minority shareholders were injured as a result of the Debt/Equity Swap.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in Sweports' favor and against Clarke as follows:

a.  An award of compensatory damages in an amount to be shown according to proof;

b.  An accounting;

c.  Disgorgement of any profits Clarke earned through C2C;

d.  Imposition of a Constructive Trust;

e.  Attorneys' fees and costs as permitted by law; and

f.  Such other and further relief as this Honorable Court deems just and fair.

## COUNT VIII—AIDING AND ABETTING
**(Plaintiffs, derivatively on behalf of the Companies, against Leisner)**

235.    Plaintiffs hereby incorporate by reference paragraphs 1 through 159 of this Complaint as if fully set forth herein.

236.    Clarke knowingly and intentionally took for his own benefit the opportunity to

29

develop the Rechargeable Chlorine Technology by having C2C negotiate the UofT/C2C License Agreement.

237.     Clarke knowingly and intentionally engaged in a scheme to fund C2C's operations by stripping funds and valuable assets away from UMF and Sweports.

238.     Clarke concealed these activities from the Companies and their minority shareholders.

239.     Clarke had a fiduciary duty to disclose to the Companies and their minority shareholders the creation of C2C and his ownership interest and control over C2C, the UofT/C2C License Agreement, the UMF Loans, the development efforts UMF was undertaking for C2C, the Micrillon Assignment, the PerfectClean license to C2C and the Debt/Equity Swap.

240.     Clarke's causing these transactions to occur breached his fiduciary duties to the Companies.

241.     Leisner knowingly and substantially assisted Clarke in perpetrating these transactions.

242.     Leisner was continually and actively involved in perpetrating these transactions with Clarke.

243.     On information and belief, Leisner was, at all times relevant herein, aware of his role in these transactions and their likely effect on the Companies.

244.     On information and belief, Leisner was, at all relevant times herein, aware of Clarke's fiduciary duties to the Companies.

245.     On information and belief, Leisner was continually aware of Clarke's fiduciary duty to disclose these transactions to the Companies and their shareholders.

246.     These transactions caused substantial injuries to the Companies and their minority

30

shareholders.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in the Companies' favor and against Leisner as follows:

    a.  An award of compensatory damages in an amount to be shown according to proof;

    b.  Attorneys' fees and costs as permitted by law; and

    c.  Such other and further relief as this Honorable Court deems just and fair.

**COUNT IX—FRAUD**
**(Plaintiffs, derivatively on behalf of the Companies, against Clarke)**

247.    Plaintiffs hereby incorporate by reference paragraphs 1 through 159 of this Complaint as if fully set forth herein.

248.    Clarke knowingly and intentionally took for his own benefit the opportunity to develop the Rechargeable Chlorine Technology by having C2C negotiate the UofT/C2C License Agreement.

249.    Clarke knowingly and intentionally engaged in a scheme to fund C2C's operations by stripping funds and valuable assets away from the Companies.

250.    Clarke concealed these activities from the Companies and their minority shareholders.

251.    Clarke had a fiduciary duty to disclose to the Companies and their minority shareholders the creation of C2C and his ownership interest and control over C2C, the UofT/C2C License Agreement, the UMF Loans, the development efforts UMF was undertaking for C2C, the Micrillon Assignment, the PerfectClean license to C2C and the Debt/Equity Swap.

252.    These transactions represented material facts that Clarke had a duty to disclose to the Companies and their minority shareholders.

253.    Clarke's silence concerning these transactions concealed his misconduct from the

31

Companies and their minority shareholders.

254. The Companies and their minority shareholders reasonably relied on Clarke's acting in good faith towards the Companies and their minority shareholders by fulfilling his fiduciary duties.

255. Clarke's omissions were material.

256. The Companies and their minority shareholders were injured by Clarke's fraudulently concealing these transactions and his misconduct.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in the Companies' favor and against Clarke as follows:

a. An award of compensatory damages in an amount to be shown according to proof;

b. An award of punitive damages;

c. Attorneys' fees and costs as permitted by law; and

d. Such other and further relief as this Honorable Court deems just and fair.

## COUNT X—CIVIL CONSPIRACY
### (Plaintiffs, derivatively on behalf of the Companies, against Defendants)

257. Plaintiffs hereby incorporate by reference paragraphs 1 through 159 of this Complaint as if fully set forth herein.

258. Leisner and Clarke formed C2C with the express understanding of using it to facilitate the development of the Rechargeable Chlorine Technology based upon the Patent.

259. The Rechargeable Chlorine Technology is a natural extension of the PerfectClean technology.

260. Defendants knew, or reasonably should have known, that the Rechargeable Chlorine Technology covered by the Patent represents a product that, if developed, would be similar to the PerfectClean products covered by Sweports' intellectual property and sold by UMF.

32

261. Through the formation of C2C, Leisner and Clarke agreed to develop the Rechargeable Chlorine Technology independent of Sweports.

262. Clarke had a fiduciary duty to disclose to the Companies and their minority shareholders the creation of C2C and his ownership interest and control over C2C, the UofT/C2C License Agreement, the UMF Loans, the development efforts UMF was undertaking for C2C, the Micrillon Assignment, the PerfectClean license to C2C and the Debt/Equity Swap.

263. By engaging in and failing to disclose these transactions, Clarke breached his fiduciary duties to the Companies.

264. Clarke and Leisner both undertook steps to further their agreement of developing the Rechargeable Chlorine Technology independent of Sweports through these transactions.

265. Clark and Leisner knowingly and voluntarily conspired to effectuate these transactions in order to further their agreement to develop the Rechargeable Chlorine Technology independent of Sweports.

266. The Companies have suffered damages as a direct result of the Clarke and Leisner's conspiracy and the resulting transactions.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in the Companies' favor and against Defendants as follows:

a. An award of compensatory damages in an amount to be shown according to proof;

b. Attorneys' fees and costs as permitted by law; and,

c. Such other and further relief as this Honorable Court deems just and fair

Respectfully submitted,

**Lee Abrams**, an individual derivatively on behalf of Sweports Ltd., and UMF Corporation, and **Tina White**, an individual derivatively on behalf of Sweports Ltd., and

33

UMF Corporation, *Plaintiffs*

By: _____

One of their attorneys

George M. Sanders
Brian P. Jakulevicius
Thomas J. Bacon
Law Offices of George M. Sanders, P.C.
150 North Michigan, Suite 2800
Chicago, Illinois 60602
(312) 624-7645
Attorney No. 42373

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109), the undersigned certifies that the statements set forth in the *Verified Complaint for Breach of Fiduciary Duty and Other Relief* are true and correct, except as to matters therein stated to be on information and belief as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

By: _____
    Lee Abrams

By: _____
    Tina White

35

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109), the undersigned certifies that the statements set forth in the *Verified Complaint for Breach of Fiduciary Duty and Other Relief* are true and correct, except as to matters therein stated to be on information and belief as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

By: _____

      Lee Abrams

By: _____

      Tina White

35